In the Matter of 324 Liquor Corp., Doing Business as Yorkshire Wine & Spirits, Appellant, v Edward J. McLaughlin et al., Respondents.

First Department, July 12, 1984

**APPEARANCES OF COUNSEL**

*Seymour Howard* for appellant.

*Robert S. Hammer* of counsel (*Richard G. Liskov* with him on the brief; *Robert Abrams, Attorney-General,* attorney), for respondents.

MILONAS, J.

This CPLR article 78 proceeding was commenced by petitioner, a retail liquor and wine dealer, to review and annul a determination of the State Liquor Authority, dated November 12, 1982, which held it in violation of section 101-bb of the Alcoholic Beverage Control Law and imposed a penalty of a 10-day suspension of its license plus a $1,000 bond forfeiture. At the administrative hearing in connection with the instant matter, counsel for both parties stipulated that on June 24, 1981, a State Liquor Authority investigator purchased a 1.75 liter bottle of Chatham Gin, 92 proof, for $9.45 plus sales tax and a 1.75 liter bottle of Smirnoff Vodka, 80 proof, for $11.59 plus sales tax. Both of these brands were advertised by petitioner at the same prices. The Authority then produced as its only witness the principal clerk in charge of the price scheduling section, who testified as to the price schedules filed by petitioner's suppliers for the month of June, 1981. These schedules, which were introduced into evidence, indicated that the minimum consumer retail price for Chatham Gin was $9.65 plus tax and $11.89 plus tax for Smirnoff's Vodka.

While the foregoing facts are not in dispute, petitioner does challenge the validity of the statutory scheme and the regulations involved herein. In that regard, petitioner contends that the State's pricing machinery requires wholesalers to establish minimum retail prices for brands of liquors, eliminates price competition between retailers and is, therefore, invalid as a violation of the Federal Sherman Antitrust Act. Petitioner also asserts that by promulgating Rule 16, as set forth in Bulletin No. 471, the State Liquor Authority exceeded its lawful authority. Respondents, however, argue that the statutory provisions in question do not establish a mechanism for price maintenance but, rather, is merely a price-posting law of the sort found to be valid by the Court of Appeals in *Matter of Admiral Wine & Liq. Co. v State Liq. Auth.* (61 NY2d 858). In addition, respondents claim that Rule 16 constitutes a reasonable exercise by the State Liquor Authority of its authority under the Alcoholic Beverage Control Law. In dismissing the article 78 proceeding, Special Term consid-

ered respondents' position to be persuasive (119 Misc 2d 746).

Section 101-b (subd 3, pars [a], [d]) of the Alcoholic Beverage Control Law mandate manufacturers and distillers to file monthly schedules with the State Liquor Authority, listing their prices to wholesalers, along with an affirmation that the prices are no higher than the lowest prices charged to wholesalers in any other State. This requirement does not affect the minimum retail price which the retailer may charge the consumer. Section 101-b (subd 3, par [b]) requires wholesalers to file schedules of their prices to retailers which shall state "the number of bottles contained in each case, the bottle and case price to retailers * * * the discounts for quantity, if any". Consequently, when a wholesaler first obtains a brand of liquor for resale to retailers, it alone fixes its "legal price" for that brand. No statute or rule dictates the initial price which a wholesaler may set; there is no review procedure in existence, nor does the agency maintain any standards or prohibitions. The only restriction on pricing is that a wholesaler may not thereafter increase its price without the agency's approval.

When a wholesaler has fixed the "legal case price" on a brand of liquor, Rule 16 then comes into operation. According to Rule 16.4 (e): "For each item of liquor listed in the schedule of liquor prices to retailers there shall be posted a bottle and a case price. The bottle price multiplied by number of containers in the case must exceed the case price by approximately $1.92 for any case of 48 or fewer containers. The figure is to be reached by adding $1.92 to the case price, dividing by the number of containers in the case, and rounding to the nearest cent. Where more than 48 containers are packed in a case, bottle price shall be computed by dividing the case price by the number of containers in the case, rounding to the nearest cent, and adding one cent." (9 NYCRR 65.4 [e].)

Thus, if the "legal case price" of a brand of liquor is determined by the wholesaler to be $60 per case, and the case contains six bottles, the legal price becomes $60 plus $1.92 divided by 6, or $10.32 per bottle. After having filed the first schedule, the wholesaler may at its own discretion

reduce or "post-off" the "legal case price" of any brand of liquor without restriction. The wholesaler is free even to sell a brand below cost. Pursuant to Bulletin No. 471, which was issued in June of 1973, the wholesaler was given even greater latitude in setting the minimum retail price of a brand of liquor. The Authority now notified wholesalers that they would be allowed to decide unilaterally whether a "post-off" on the case price of a brand should be accompanied by a similar reduction in the bottle price. In that regard, the wholesaler could follow one of three alternatives: (1) elect not to reduce the bottle price, (2) reduce the bottle price to conform with the "post-off" case price, or (3) adopt a bottle price anywhere between the extremes permitted under options "1" and "2".

Subdivision 2 of section 101-bb of the Alcoholic Beverage Control Law provides that the bottle price fixed by a wholesaler in its monthly schedule plus 12% of that price totals the minimum authorized retail price for that brand. Except for this statutorily mandated 12% markup on the wholesaler's bottle price, the State does not review, supervise, control or participate in the wholesaler's largely unlimited price-fixing role. For instance, if the wholesaler, in accordance with Bulletin No. 471, reduces or "posts-off" the case price of a brand of liquor from $60 to $55 a case but retains the legal bottle price of $10.32, any retailer purchasing a case of that brand is then prohibited from selling below the $10.32 legal bottle price plus 12% of that price, or $11.56 per bottle. Based on the $55 cost, the return to the retailer is not a markup of 12% but of 26%. Indeed, wholesalers are permitted to set the bottle and case prices in such a manner as to afford the retailers huge markups, while ensuring that there is no competition at the retail level and that, consequently, the profits available to the wholesalers and the retailers are not passed along to the consumers.

It is a principle of law that the construction generally given to statutes and regulations by the agency responsible for their administration will, if not irrational or unreasonable, be upheld. (*Matter of Johnson v Joy,* 48 NY2d 689; *Matter of Howard v Wyman,* 28 NY2d 434.) However, in *Kurcsics v Merchants Mut. Ins. Co.* (49 NY2d 451, 459), the

Court of Appeals declared that where "the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretive regulations are therefore to be accorded much less weight. And, of course, if the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight."

The leading case in the subject matter before us is *California Liq. Dealers v Midcal Aluminum* (445 US 97). After examining California's plan for wine pricing, the United States Supreme Court found that that State's system, by illegally restraining trade, constituted price maintenance in violation of the Sherman Act. The court, after referring to the power of the wine producer to prevent price competition by dictating the prices charged by wholesalers, stated that "such vertical control destroys horizontal competition as effectively as if wholesalers 'formed a combination and endeavored to establish the same restrictions . . . by agreement with each other'" (at p 103). The court then proceeded to consider whether the State's involvement in the price-setting program was sufficient to establish antitrust immunity under *Parker v Brown* (317 US 341). Based upon its interpretation of a series of its own prior rulings, the court concluded (at pp 105-106) that: "These decisions establish two standards for antitrust immunity under *Parker* v. *Brown*. First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself * * * The California system for wine pricing satisfies the first standard. The legislative policy is forthrightly stated and clear in its purpose to permit resale price maintenance. The program, however, does not meet the second requirement for *Parker* immunity. The State simply authorizes price setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any 'pointed reexamination' of the program. The national policy in favor of competition cannot be thwarted

by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement."

The Supreme Court went on to agree with the view expressed by the California Supreme Court in *Rice v Alcoholic Beverage Control Appeals Bd.* (21 Cal 3d 431) that the State interests asserted by California were "less substantial than the national policy in favor of competition." (*California Liq. Dealers v Midcal Aluminum, supra,* at p 113.) In *Rice,* the court therein had described the California scheme as one in which "the prices imposed upon the retailers are those determined in the sole discretion of the producers, and * * * the department does not participate in determining the minimum price, but only enforces the price set by the producers." (21 Cal 3d, at p 440.)

Following the decision by the United States Supreme Court in *California Liq. Dealers v Midcal Aluminum* (*supra*) the New York Court of Appeals in *Matter of Mezzetti Assoc. v State Liq. Auth.* (51 NY2d 761) declared invalid the minimum pricing scheme for wine. Although the Court of Appeals has not yet reviewed the validity of the price maintenance program at issue here, it did hold that the State Liquor Authority exceeded its authority under the Alcoholic Beverage Control Law in requiring that the New York City excise tax, or a 20% markup, be included in the cost to consumers. (*Mancini v McLaughlin,* 54 NY2d 860.)

Respondents, in urging that the New York State Legislature has enacted a price-posting rather than a price-maintenance system, point to *Matter of Admiral Wine & Liq. Co. v State Liq. Auth.* (*supra*) and *Battipaglia v New York State Liq. Auth.* (583 F Supp 8 [SDNY, 1982]) in support of their position. However, in neither of those cases was a minimum resale pricing scheme involved. Indeed, both courts specifically asserted that the requirement to post wine prices is not a resale price maintenance law. According to the court in *Admiral,* "Subdivision 3 of section 101-b does not authorize anyone to determine retail prices for wine, nor does it bind other wholesalers as to the prices which they may charge their dealers" (61 NY2d, at p 861). Significantly, there is no resale price maintenance statute in New York which relates to the retail sale of

wine, and section 101-b of the Alcoholic Beverage Control Law, insofar as it pertains to wine, has no relevance to any statutory minimum retail price.

Respondents' reliance upon *Serlin Wine & Spirit Merchants v Healy* (512 F Supp 936, affd *sub nom. Morgan v Division of Liq. Control,* 664 F2d 353) is similarly misplaced. The court in that situation distinguished *California Liq. Dealers v Midcal Aluminum (supra)* not on the ground that the disputed statute was simply a price-posting law but because the State of Connecticut actually set the price, establishing the markup of both the wholesalers and the retailers and thereby supervising and restricting the wholesalers in fixing their price to retailers. Unlike the New York pricing system, every segment of the liquor industry was controlled by specific markups directed by Connecticut. Consequently, the Connecticut statutory plan complied with the second standard enunciated by the United States Supreme Court — that is, the State policy must be "actively supervised" by the State itself. In New York, on the other hand, except for the 12% markup mandated by subdivision 2 of section 101-bb, the State has no review, supervision or control over the wholesaler in setting the case or the bottle price of a brand of liquor. The wholesaler is at liberty to charge any bottle price that it deems fit in any month subject only to a ceiling it itself established, the "legal price". Other than the fact that the wholesaler needs the Authority's approval to raise the "legal price", the agency has no power to review or limit in any way the prices fixed by the wholesalers. In fact, by virtue of Bulletin No. 471, the Authority directly encourages the wholesaler to use its unfettered discretion in establishing prices, and then the agency simply enforces the minimum retail resale prices.

Subdivision 1 of section 101-b of the Alcoholic Beverage Control Law provides that: "It is the declared policy of the state that it is necessary to regulate and control the manufacture, sale and distribution within the state of alcoholic beverages for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate the undue stimulation of sales of alcoholic beverages and the practice of manufac-

turers and wholesalers in granting discounts, rebates, allowances, free goods, and other inducements to selected licensees, which contribute to a disorderly distribution of alcoholic beverages, and which are detrimental to the proper regulation of the liquor industry and contrary to the interests of temperance, it is hereby further declared as the policy of the state that the sale of alcoholic beverages should be subjected to certain restrictions, prohibitions and regulations."

There is no doubt that this statement of policy is sufficient to meet the first standard necessary to establish antitrust immunity under *Parker v Brown (supra)*. However, it is the second requirement, that the State must actively supervise or review the fixing of prices, which the New York price maintenance scheme clearly fails to satisfy. The prices are set by the wholesalers, and the Authority enforces them. Moreover, all retailers are bound by these prices. Since the wholesaler may amend its schedule downward to meet competition, the pricing mechanism in New York not only enables the wholesaler to destroy price competition by dictating the minimum prices to retailers but also prevents horizontal competition. In addition, notwithstanding section 101-b of the Alcoholic Beverage Control Law, which expressly forbids any discount in excess of 2% for quantity purchases of liquor by a retailer, the Authority, by issuing Bulletin No. 471, permits the wholesaler to give a discount of over 2% to those retailers who purchase a case or more of a brand of liquor and also allows the wholesaler to fix a minimum retail resale price which affords case purchasers a markup far above the 12% authorized by statute. Yet, nowhere does the Alcoholic Beverage Control Law delegate any power to the agency to fix prices or permit wholesalers to grant discounts in excess of those dictated by section 101-b. It is evident that the New York State pricing maintenance scheme for liquors not only violates the Sherman Antitrust Act but that, even within the system enacted by the Legislature, the State Liquor Authority exceeded its authority. (See *Matter of J.A.J. Liq. Store v New York State Liq. Auth.*, 102 AD2d 240, in which the Second Department reached the same conclusion as this court regarding the validity of the New

York State statutory resale retail price maintenance system for alcoholic beverages.)

Consequently, the judgment of the Supreme Court, New York County (Arthur Blyn, J.), entered on July 1, 1983, which dismissed petitioner's application pursuant to CPLR article 78 should be reversed, on the law, the petition granted, and the determination of the State Liquor Authority, dated November 12, 1982, annulled, without costs or disbursements.

SULLIVAN, J. P., CARRO and ALEXANDER, JJ., concur.

Judgment, Supreme Court, New York County, entered on July 1, 1983, unanimously reversed, on the law, the judgment vacated, the petition granted, and the determination of the State Liquor Authority dated November 12, 1982 annulled, without costs and without disbursements.